**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| Mary Stapleton, | Case No. 17 C 5589 |
| Plaintiff, | Hon. LaShonda A. Hunt |
| v. | |
| Nestle USA, Inc., | |
| Defendant. | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Mary Stapleton sued her now-former employer, Defendant Nestle USA, Inc., alleging discrimination based on race and sex in violation of Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e *et seq.*, and 42 U.S.C. § 1981, and age in violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq*. Currently pending before the Court is Nestle's motion for summary judgment [119] on these discrimination claims. For the reasons discussed below, the motion is granted.

**BACKGROUND**

The undisputed facts are taken from the parties' statements. Stapleton, an African American woman, was 58 years old at the time of the incidents in question in July 2016. Nestle operated a candy manufacturing facility where Stapleton had worked for approximately 25 years as a full-time utility person. Her duties included supplying materials such as wrapping paper for candy to the manufacturing line, cleaning up the work area, placing production and packaging materials in designated areas, stacking and wrapping pallets, emptying and replacing catch pans, and performing other work as directed by a supervisor. She regularly worked on Line 9—the "Butterfinger" line—and considered that her home line even though work assignments could

1

change from week to week. Stapleton would occasionally take voluntarily layoffs when Line 9 was down rather than work on different lines because she considered Line 9 to be the "most important." Stapleton's utility person position was classified as a Labor Grade 7 and she worked the "B" shift under supervisor Cynthia Starks.

On July 18, 2016, Stapleton returned to work after a scheduled vacation. Upon arriving at the facility and swiping her ID card to access the building, she discovered that her card did not work. When the card failed a second time, Stapleton asked a security guard why she could not access the facility. According to Stapleton, the guard told her she was not permitted to enter and then he called a woman named "Boonie." Boonie met Stapleton at the front door and took her to a trailer on company property, located about 30 feet from the door. Boonie told Stapleton that she could not return to the Nestle facility until she completed a required training, which Boonie set up for Stapleton on a computer in the trailer. Stapleton remained alone in the trailer for the full duration of her six-hour shift and completed the training; she received her pay for the shift. Starks testified that the training covered, among other topics, workplace safety and sanitation, which employees should complete before working on the production floor.

Nestle regularly used rooms inside the facility for mandatory employee training which Stapleton had attended in the past. This was her first time completing training in the trailer. She acknowledges that all different kinds of employees, including at least one African American male, also took training and make-up courses in the trailer. However, Stapleton contends no other employee took the training alone without an instructor or other monitor there to assist them. Furthermore, Stapleton claims that Eric Anderson, a white male co-worker around her age who had also missed the training, did not have his ID card deactivated.

2

Anderson was a line mechanic in the Nips Department at Nestle who worked the "B" shift. He had completed training in the trailer after missing required sessions and had been able to schedule a time to make them up at his convenience. He did not believe that his ID had ever been deactivated, though. While Anderson could not specifically recall whether he was on vacation in July 2016, he testified that if he was, he would have taken the training in the trailer upon his return.

Starks stated that she was aware of discussions about instituting a policy whereby an employee's ID card would be deactivated after the employee failed to take the required training on multiple occasions, but she did not know if this policy had ever been adopted. Starks confirmed that employees unable to attend mandatory training could arrange with their supervisor to complete the training at a later time. Stapleton stated that after being locked out, some unidentified person told her there was a post on the bulletin board in her department identifying employees who needed to make up mandatory training and informing them when they could do so. According to Stapleton, those employees were permitted in the building.

On July 18, 2016, Stapleton heard from co-workers that she had been moved from Line 9 (the "Butterfinger" line) to Line 2 (the "Dairy Queen" line). She said this caused her blood pressure to rise, requiring her to take sick leave from July 19 through August 5, and she felt humiliated and embarrassed. Upon returning to work in August and asking why she had been moved to a different line, Stapleton was told that that she had voluntarily signed off from Line 9 prior to her vacation. Stapleton disputes that she agreed to any such change. She further claims that Nestle replaced her on Line 9 with a newer hire, a male she assumed to be in his twenties and Hispanic. Stapleton does not know this employee's name or his labor grade.

After August 5, 2016, Stapleton worked on Lines 2, 12, and 9, with most of her time spent on Line 2. Her shift, hours, and pay remained the same regardless of whether she worked on Line

2 or Line 9. Nevertheless, Stapleton testified that she was confined to the line on Line 2, whereas she could move around when on Line 9, and that her tasks on Line 2 could change from day-to-day based on what her supervisor instructed her to do during any given shift. Starks stated that while no line was better than any other, Line 9 was the most difficult. Still, even though a utility person would work various jobs on Line 9 and a specific job daily on Line 2, the duties were not materially different between the two lines for someone designated as Labor Grade 7. Stapleton maintains that she was not eligible for additional overtime work on Line 2, as she had been on Line 9. Starks testified that she did not know how much overtime opportunities differed between the lines.

Stapleton eventually sued Nestle for race, sex, and age discrimination based on the deactivated ID badge and trailer training as well as the line change. When asked why she felt her move from Line 9 to Line 2 constituted race and sex discrimination, Stapleton responded she "can't explain it," and when asked why it constituted age discrimination, she expressed that Nestle "wanted the facility to be full of younger people."

After discovery, Nestle moved for summary judgment. The matter is fully briefed and ripe for ruling.

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party" and "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is the time for a litigant to "put up or shut up" by "show[ing] what evidence it has that would convince a trier of fact to accept

its version of events." *Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 938 (7th Cir. 2021) (quotations omitted). "Inferences supported only by speculation or conjecture will not suffice," nor will "the mere scintilla of evidence." *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018). All reasonable inferences must be drawn in favor of the non-moving party, and a court must refrain from weighing evidence, drawing inferences, or making credibility determinations. *Id.* at 893.

## DISCUSSION

### I.  Race and Sex Discrimination[1]

Under Title VII of the Civil Rights Act, an employer may not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2000e-2(a)(1). In Title VII cases, "an unlawful employment practice is established when the [plaintiff] demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." *Id.* at § 2000e-2(m). There are two tests a plaintiff may rely upon to prove claims of race or sex discrimination.

The first test is the traditional burden-shifting method articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*. 411 U.S. 792 (1973). Under *McDonnell Douglas*, a plaintiff must establish a *prima facie* case of discrimination by showing that "(1) he belongs to a protected class; (2) he met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) another similarly situated employee outside of his protected class received better treatment from the employer." *Igasaki v. Ill. Dep't of Fin. and Pro. Regul.*, 988 F.3d 948, 957 (7th Cir. 2021). If a plaintiff meets those requirements, the burden shifts to the employer to "articulate

---

[1] The legal analysis for discrimination claims under Title VII and 42 U.S.C. § 1981 is identical. *See McCurry v. Kenco Logistics Servs., LLC*, 942 F.3d 783, 788 (7th Cir. 2019).

some legitimate, nondiscriminatory reason" for the adverse action. *McDonnell Douglas*, 411 U.S. at 802. If the employer is successful, the burden then shifts back to the plaintiff to demonstrate that the employer's proffered reason is pretextual. *Igasaki*, 988 F.3d at 957 (quoting *Purtue v. Wis. Dep't of Corr.*, 963 F.3d 598, 602 (7th Cir. 2020)).

The second test was recently articulated by the Seventh Circuit in *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016). In an effort to tackle the "rat's nest" of various tests used in employment discrimination cases in this circuit, particularly those that attempted to distinguish between direct and indirect evidence, the Seventh Circuit concluded that "all evidence belongs in a single pile and must be evaluated as a whole." *Id.* at 765. Significantly, *Ortiz* made clear that its standard remained consistent with the *McDonnell Douglas* standard. In this case, the parties have evaluated Stapleton's claims of employment discrimination under both the *McDonnell Douglas* and *Ortiz* frameworks. Accordingly, the Court will do the same.

### A. <u>Prima Facie Case</u>

Nestle does not dispute that Stapleton is a member of a protected class or that, for purposes of this motion, she was meeting its legitimate expectations. At issue is whether Stapleton has shown that she suffered an adverse employment action and that a similarly situated employee who is not a member of her protected class was treated better. The Court concludes that she has not.

### 1. Adverse Employment Action

An adverse employment action "significantly alters the terms and conditions of the employee's job." *Griffin v. Potter*, 356 F.3d 824, 829 (7th Cir. 2004). Such an action must be "materially adverse, not merely an inconvenience or a change in job responsibilities." *Id.* Three "general categories of materially adverse employment actions actionable under Title VII" have been recognized by the Seventh Circuit. *O'Neal v. City of Chi.*, 392 F.3d 909, 911 (7th Cir. 2004).

These categories include: "(1) cases in which the employee's compensation, fringe benefits, or other financial terms of employment are diminished, including termination; (2) cases in which a nominally lateral transfer with no change in financial terms significantly reduces the employee's career prospects by preventing her from using her skills and experience, so that the skills are likely to atrophy and her career is likely to be stunted; and (3) cases in which the employee is not moved to a different job or the skill requirements of her present job altered, but the conditions in which she works are changed in a way that subjects her to humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in her workplace environment." *Id*. Still, "not everything that makes an employee unhappy is an actionable adverse action." *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996).

Nestle contends that temporarily disabling Stapleton's ID card until she completed required training in a trailer outside the facility did not significantly alter the terms and conditions of her employment. In support of its argument, Nestle points out that neither action impacted Stapleton's hours, salary, benefits, job duties, or job title, and she was paid for the time spent taking the training, just like all other manufacturing employees. Similarly, Nestle maintains that Stapleton's reassignment from Line 9 to Line 2 also did not constitute an adverse employment action because it was a lateral transfer which, again, did not result in a change of salary, benefits, shift or schedule, hours, supervisor, or job duties. Finally, Nestle characterizes Stapleton's argument about a loss of overtime after the switch as purely speculative.

Stapleton counters that all these actions—from the deactivation of her ID card to the requirement that she complete training in the trailer alone to the subsequent line reassignment— must be viewed in light of the entire record. Doing so, she contends, shows the material change in her employment status as a result of the combined effect of Nestle's conduct. Stapleton emphasizes

that these events left her feeling humiliated and embarrassed in front of her co-workers, and as though she had no job or title at a company where she used to work on what she considered to be the most important line in the manufacturing plant. This, she contends, was a demotion in form or substance.

The Court agrees that Stapleton has not shown that she suffered an adverse employment action. Starting with the "lock-out" and forced training outside the facility, as Stapleton describes the situation, those are not actionable. While neither party cites authority that is directly on-point, the Court finds that, at most, Stapleton suffered a mere inconvenience, which is not sufficient to establish a *prima facie* case. *See Tyler v. Ispat Inland Inc.*, 245 F.3d 969, 973 (7th Cir. 2001). True, she was temporarily prevented from entering the facility while she completed required training in the designated trailer that all other employees were using for make-up training. But in the end, Stapleton maintained the same job title as she had for the past 25 years, and she received her full pay for that shift. Her work location was altered, so that instead of being on the production floor, she sat in a trailer in front of a computer. But no material change in the terms and conditions of her employment resulted from that minor deviation from her usual duties on July 18, 2016.

Turning to the move from Line 9 to Line 2, the Court finds that is akin to a lateral transfer within the company, which rarely constitutes an adverse employment action. "By definition, any lateral job transfer will result in changes to an employee's job responsibilities and work conditions. To sustain a federal employment discrimination suit, a plaintiff must show something more than the ordinary difficulties associated with a job transfer." *O'Neal*, 392 F.3d at 913. "[A] *purely* lateral transfer, that is, a transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action. A transfer involving no reduction in pay and no more than a minor change in working conditions will not do, either." *Williams v. Bristol-Myers*

8

*Squibb Co.*, 85 F.3d 270, 274 (7th Cir. 1996). Additionally, a reassignment must involve "significantly different responsibilities" to constitute an adverse action. *Bell v. E.P.A.*, 232 F.3d 546, 555 (7th Cir. 2000) (citations omitted). A reassignment where the employer has a "purely subjective preference for one assignment over another" is not actionable. *Nichols v. S. Ill. Univ.- Edwardsville*, 510 F.3d 772, 781 (7th Cir. 2007). Certainly, "being shifted to an essentially equivalent job that [an employee does] not happen to like as much does not a Title VII claim create." *Place v. Abbott Labs.*, 215 F.3d 803, 810 (7th Cir. 1996).

Again, Stapleton's salary, benefits, schedule, hours, supervisor, and job duties all remained the same. More importantly, she conceded that line positions could change weekly and thus, her home line was not even a guaranteed assignment. In *Tyler*, the Seventh Circuit rejected an employee's claim that a transfer from one plant to another without a change of salary or benefits was actionable. 245 F.3d at 973. Plaintiff argued that one plant provided an opportunity to use equipment that was not available at the other plant, which better positioned him for a promotion, but that contention was "tenuous at best" and "pure speculation." *Id.* Likewise, Stapleton offers nothing more than conjecture that Line 2 afforded less overtime opportunities than Line 9. Even her supervisor Starks could not substantiate that contention.

It is true that a reduction in pay or a change in benefits is not required to establish that an employment action is adverse. *Smart*, 89 F.3d at 441 (explaining that an adverse action can "extend beyond readily quantifiable losses"). That said, changes such as reporting to a former subordinate or being given a different title are "largely semantic" when there is no accompanying reduction in salary, benefits, or responsibility. *Flaherty v. Gas Rsch. Inst.*, 31 F.3d 451, 456 (7th Cir. 1994). And even though some of Stapleton's exact responsibilities may have differed on Line 2, she provides no factual support to show that the overall utility person position changed significantly once she

was more frequently assigned to Line 2. *See Crady v. Liberty Nat'l Bank and Tr. Co. of Ind.*, 993 F.2d 132, 136 (7th Cir. 1993) (finding no adverse action where the change in an employee's responsibilities was not less significant than his prior responsibilities). Clearly, Stapleton was not happy that her Line 2 tasks could vary day-to-day based on the instructions of the supervisor, but, again, a transfer that causes "personal inconvenience" does not count as an adverse employment action. *Flaherty*, 31 F.3d at 456.

Finally, Stapleton contends that all these actions together resulted in her feeling humiliated and embarrassed in front of her co-workers, and given her seniority, functioned as a demotion. She cites *Herrnreiter v. Chi. Hous. Auth.*, 315 F.3d 742 (7th Cir. 2002) in support, but that case does not support her argument. *Herrnreiter* discusses "[c]ases in which the employee is not moved to a different job or the skill requirements of his present job altered, but the *conditions* in which he works are changed in a way that subjects him to humiliating, degrading, unsafe, unhealthy, or otherwise significantly negative alteration in his workplace environment—an alteration that can fairly be characterized as objectively creating a hardship, the classic case being that of the employee whose desk is moved into a closet." *Id.* at 744. Nothing of the sort occurred here. What Stapleton describes is a "subjective preference for one position over another." *Id.* at 745.

Indeed, it is important to distinguish between humiliating workplace *conditions* and humiliation subjectively perceived by Stapleton. Unfortunately, "neither a 'bruised ego' . . . nor public humiliation rises to the level of an adverse employment action." *Watson v. Potter*, 23 F. App'x 560, 564 (7th Cir. 2001) (citation omitted) (employee required to attend basic training for "newly promoted supervisors" did not suffer adverse employment action even though he was humiliated by having to take the training). "To be actionable, the embarrassing condition must be severe or pervasive and not the result of reasonable and legitimate employment concerns." *Id.*

Further, as it relates to a job transfer, finding a job transfer humiliating or even "the equivalent of a demotion" does not make the transfer an adverse employment action. *Madlock v. WEC Energy Grp., Inc.*, 885 F.3d 465, 472 (7th Cir. 2018). "Some people thinking an action is 'humiliating' is not enough, on its own, to raise the action to the level of an adverse employment action." *Id.* In determining whether an action is adverse, the Court must view the action with "an amount of objectivity." *Id.* Otherwise, an employer would engage in an adverse employment action every time an employee felt humiliated, regardless of what the action was and how it may be viewed by anyone else.

At the end of the day, Stapleton preferred to be on Line 9 where she had worked for the last 25 years, as evidenced by the fact that when Line 9 was not operational, she opted for temporary, voluntary layoffs as opposed to working on a different line. But neither Stapleton's personal preference for Line 9 nor her belief that it was superior and anything else a demotion nor the subjective humiliation or embarrassment she felt from any of the incidents in July 2016, rise to the level of an adverse employment action.

Finally, Stapleton asserts that the transfer from Line 9 to Line 2 resulted in a loss of overtime opportunity. While such a loss may constitute an adverse employment action "[w]hen overtime or premium pay is a significant and expected part of an employee's annual earnings," *Formella v. Brennan*, 817 F.3d 503, 511 (7th Cir. 2016), Stapleton has not offered any evidence to support that finding. In *O'Neal*, plaintiff argued, among other things, that her transfer from one unit to another resulted in her receiving less overtime opportunity. 392 F.3d at 912. But absent evidence showing that she took home less pay in her new position, the court found that "speculation . . . is insufficient to defeat summary judgment." *Id.*

## 2. Similarly Situated Employee Outside Protected Class

"Employees are similarly situated if they are directly comparable in all material respects." *Raymond v. Ameritech Corp.*, 442 F.3d 600, 610 (7th Cir. 2006). The purpose of this prong is to eliminate other explanatory variables outside of the employee's protected class. *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012). While there is no "magic formula" to determine whether the motivation was indeed discriminatory animus, *id.* at 846-47 (quotations omitted), "the court must look at all relevant factors, including whether the employees (i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications—provided the employer considered these latter factors in making the personnel decision." *Bio v. Fed. Express Corp.*, 424 F.3d 593, 597 (7th Cir. 2005) (quoting *Ajayi v. Aramark Bus. Servs., Inc.*, 336 F.3d 520, 532 (7th Cir. 2003)). The similarly situated inquiry is fact intensive. *Raymond*, 442 F.3d at 610.

Stapleton points to Anderson, a white male, as her comparator. But her failure to provide *any* relevant evidence about Anderson dooms her case. It is undisputed that he was a line mechanic who worked a different position in a different department. Stapleton offered no basis for the Court to find that a utility person and line mechanic should be treated the same. Aside from the general requirement that all manufacturing employees complete certain training, there is no evidence in the record that Stapleton and Anderson were subject to the same standards, reported to the same supervisor, or had comparable experiences, education, or qualifications. Indeed, all Stapleton can say about Anderson is that he is a white male who missed the required training in July 2016. That is not enough for the Court to even assess, let alone conclude, that she and he are comparable in all material respects.

Stapleton insists that someone told her that Nestle posted information about make-up training times on a bulletin board after her ID card was temporarily deactivated and she was required to take the training in the trailer. If that is true—a fact Stapleton has not established—the record is still silent as to whether others outside her protected classes of African American or female benefitted from any such policy.

Finally, with respect to her reassignment from Line 9 to Line 2, Stapleton makes no attempt to identify a similarly situated comparator.

Therefore, she has not demonstrated a *prima facie* case of race or sex discrimination.

### B. Legitimate, Non-Discriminatory Reason

Even if Stapleton had met her burden, Nestle has articulated a legitimate, non-discriminatory explanation for its conduct. Starks explained that the training Stapleton missed covered a variety of pertinent topics, including quality, sanitation, and safety. Given Stapleton's job on the production floor, it was reasonable for Nestle to require her to take the training before returning to work. In fact, Stapleton herself testified that "all kinds of" employees made up missed training sessions in the trailer. Temporarily disabling her ID card ensured that she and other employees would complete the required training before returning to work.

Nestle has also established a legitimate and unrebutted reason for switching Stapleton primarily to Line 2. When Stapleton asked why she had been reassigned, Nestle responded that she had "signed off" Line 9, which meant she voluntarily removed herself from that position. Nestle produced a document that Stapleton purportedly signed. Stapleton insisted she did not sign anything but offered no explanation for her signature on the page. Regardless, Nestle likely did not require Plaintiff's express permission for the move, given that, as Stapleton acknowledges, her work assignments could change weekly.

C. **Pretext**

To show pretext, a plaintiff must show that the employer's explanation for an action is more than just faulty reasoning or mistaken judgment, but a lie. *Bragg v. Munster Med. Rsch. Found. Inc.*, 58 F.4th 265, 271 (7th Cir. 2023) (citations and quotations omitted). Stapleton underscores the fact that Starks never said it was Nestle's standard practice to require employees to complete this training immediately or risk having their facility ID cards deactivated until they did so. At best, that suggests Nestle's policies were not clearly established or consistently enforced. But it is not enough for the Court to infer that Nestle is lying. Stapleton was aware of other employees who were treated exactly as she was regarding missed mandatory training—they made it up in the trailer before resuming their work. Moreover, Nestle has provided unrebutted documentation showing Stapleton's agreement to sign off Line 9, which she has not proven is false. Thus, Stapleton cannot demonstrate pretext.

D. **Ortiz**

Stapleton's case fares no better under an *Ortiz* analysis. "The determinative question in discrimination cases is 'whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race . . . sex . . . or other proscribed factor caused the discharge or other adverse employment action.'" *Igasaki*, 988 F.3d at 958 (citing *Ortiz*, 834 F.3d at 765). Courts must ask whether the "totality of the evidence shows discrimination." *Igasaki*, 988 F.3d at 958. Here, as the Court has already explained, it does not. The *Igasaki* court was troubled by plaintiff's admission that he "specifically [did not] know what discriminatory reasons" the department chief had which would have impacted her treatment of plaintiff. *Id.* (quotations omitted). A similar concern exists here, as Stapleton testified that she herself could not explain why any of Nestle's actions constituted race or sex discrimination. As a long-time employee, Stapleton may have legitimately

been inconvenienced by and even humiliated by Nestle's actions, but she has not provided any evidence for this Court to conclude that her race or sex motivated Nestle's conduct. As such, her claims of race and sex discrimination do not survive summary judgment.

## II. Age Discrimination[2]

The Age Discrimination in Employment Act (ADEA) makes it unlawful for an employer:

> (1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age; (2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age; or (3) to reduce the wage rate of any employee in order to comply with this chapter.

29 U.S.C. § 623(a). Employees over the age of 40 are protected under the ADEA. *Wrolstad v. Cuna Mut. Ins. Soc'y*, 911 F.3d 450, 454 (7th Cir. 2018). While a claim of sex and race discrimination requires only a showing that discrimination was a motivating factor in an employer's decision, a claim of age discrimination requires plaintiffs to prove that but for their age, the employer would not have taken a certain action. *Id.* Both *McDonnell Douglas* and *Ortiz* also apply to age discrimination cases. *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 368 (7th Cir. 2019).

### A. *McDonnell Douglas* Analysis

As with Stapleton's claims of race and sex discrimination, the first two *McDonnell Douglas* elements are not in dispute. In July 2016, Stapleton was 58 years old and presumably meeting

---

[2] The same standard is applied for analyzing discrimination claims under the ADEA and 42 U.S.C. § 1981. *See Fields v. Bd. of Educ. of City of Chi.*, 928 F.3d 622, 625 (7th Cir. 2019).

Nestle's legitimate expectations.[3] Again applying *McDonnell Douglas*, the Court reaches the same conclusion that Stapleton has failed to show that having her ID card deactivated, being required to take training in a trailer, or being reassigned to Line 2 constituted adverse employment actions. As discussed above, none of these actions, either in isolation or combined, materially altered Stapleton's employment. The ADED "outlaws discrimination in the workplace on the basis of age, . . . not changes in duties or working conditions that cause no materially significant disadvantage to an older employee." *Spring v. Sheboygan Area Sch. Dist.*, 865 F.2d 883, 885 (7th Cir. 1989). Indeed, the ADEA's intent is not to prevent employers from changing their older employees' job responsibilities or to "'give [older employees] the right to walk out and sue their employer because they dislike their changed job responsibilities.'" *Id.* (quoting *Frazer v. KFC Nat'l Mgmt. Co.*, 491 F. Supp. 1099, 1105 (M.D. Ga. 1980)).

The only remaining *McDonnell Douglas* factor is a similarly situated comparator, which Stapleton has not attempted to identify on the temporary lock out or the training in the trailer. Stapleton makes only generalized arguments that other employees were not so mistreated, without identifying any specifically affected employees within or outside her age group. In terms of the reassignment, Nestle is correct that Stapleton has not shown any comparator was treated better than her. All she contends is that she was replaced on Line 9 by a non-black male—whom she presumed was Hispanic and under the age of 40. Even after discovery, Stapleton cannot provide this employee's name, pay grade, or actual age. Stapleton has failed to point to a comparator to establish that but for her age, she would have maintained her position on Line 9. As such, her *prima facie* case of age discrimination fails. And for all the same reasons previously discussed, Nestle

---

[3] Neither party's briefing on the age discrimination claim addresses whether Stapleton was meeting Nestle's legitimate expectations. However, the same conduct forming the basis for Stapleton's race and sex discrimination claims forms the basis for her age discrimination claim. Because Nestle admitted this point on the former claims, the Court presumes the same to be true for the latter.

has asserted legitimate non-discriminatory reasons for its actions that Stapleton has not shown are pretextual.

**B. Ortiz**

Evaluating the evidence as a whole leads the Court to the same conclusion: Stapleton has not offered facts to support her claims. Conclusory and unsupported allegations that Nestle was discriminating against older employees because it "wanted the facility to be full of younger people" is not evidence. Nor is Nestle's offer of early retirement packages persuasive proof of discriminatory intent. The Seventh Circuit has clearly stated that "an offer of incentives to retire early is a benefit to the recipient, not a sign of discrimination." *Henn v. Nat'l Geographic Soc'y*, 819 F.2d 824, 828 (7th Cir. 1987). Considering all the relevant evidence, as *Ortiz* instructs, the Court finds that Stapleton has failed to demonstrate that her age was the but for cause of any of Nestle's actions.

## <u>CONCLUSION</u>

For all the foregoing reasons, the Court grants Defendant Nestle USA, Inc.'s motion for summary judgment [119]. Judgment is entered in favor of Defendant.


Date: April 2, 2024                    **ENTERED**:

_LaShonda A. Hunt_
LaShonda A. Hunt
United States District Judge


17